David A. ROGIER, d/b/a Rogier
Associates, Appellant–
Plaintiff,

v.

AMERICAN TESTING AND ENGI-
NEERING CORPORATION, a/k/a
ATEC Associates, Inc., Appellee–De-
fendant.

No. 49A02–9910–CV–707.

Court of Appeals of Indiana.

Aug. 28, 2000.

Rehearing Denied Oct. 25, 2000.

608

Robert A. Garelick, Steven M. Crell, Cohen, Garelick & Glazier, Indianapolis, Indiana, Attorneys for Appellant.

Thomas A. Brodnik, Richard B. Kaufman, Stark Doninger & Smith, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

NAJAM, Judge

### STATEMENT OF THE CASE

David A. Rogier, d/b/a Rogier Associates ("Rogier"), filed suit against American Testing and Engineering Corporation, a/k/a ATEC Associates, Inc. ("ATEC"), for breach of the parties' exclusive listing agreement to sell ATEC's business. Rogier sought recovery of his fee for the lost

opportunity to make a sales presentation to the Michael Baker Corporation ("Baker") and for a commission from the sale of ATEC's business to ATC Environmental, Inc. ("ATC"). The trial court entered summary judgment in favor of ATEC, and Rogier appeals.

We affirm in part, reverse in part and remand for further proceedings.

## ISSUES

Rogier and ATEC present several issues for our review, which we restate as follows:

1. Whether any damages resulting from Rogier's inability to make a sales presentation to Baker were unforeseeable as a matter of law.

2. Whether the parties' exclusive listing agreement conferred upon Rogier an exclusive right to sell and, therefore, the right to a commission even if he was not the procuring cause of the sale of ATEC's business to ATC.

3. Whether the parties' exclusive listing agreement was unenforceable as a matter of law.

4. Whether the parties' exclusive listing agreement lapsed as a matter of law.

5. Whether Rogier abandoned the parties' exclusive listing agreement as a matter of law.

6. Whether Rogier waived his rights under the parties' exclusive listing agreement as a matter of law.

7. Whether ATEC's conduct in excluding Rogier from its negotiations with ATC prevented him from performing his obligations under the parties' exclusive listing agreement.

## FACTS AND PROCEDURAL HISTORY

Rogier is a marketing consultant experienced in the merger and acquisition of architectural, engineering, and environmental firms. ATEC is an environmental engineering firm. On April 24, 1984, the parties entered into an exclusive listing agreement in which ATEC appointed Rogier as its exclusive agent to search for a buyer for ATEC's business. The agreement reads in pertinent part as follows:

1. PRESENTATION MATERIALS. [Rogier] will help prepare a presentation report on [ATEC's] firm to include [ATEC's] goals, sales forecast, backlog, professional staff capability, and assets and income statement. [ATEC] will provide [Rogier] with company records and data for the purpose of preparing the presentation.

* * *

3. SEARCH. [Rogier] will search for a buyer or buyers.

4. APPROVAL OF BUYER. [Rogier] will obtain [ATEC's] approval of proposed buyers prior to making a presentation to the buyer.

5. PRESENTATION. [Rogier] will make a presentation to those buyers deemed acceptable to [ATEC].

6. EXCLUSIVE AGENT. [ATEC] appoints [Rogier] as the exclusive agent with an exclusive listing and all prospective buyers shall send copies of all correspondence and purchase offers to [ATEC] and to [Rogier].

7. SERVICES NOT INCLUDED. Both parties agree that [Rogier] shall function as a marketing Consultant and that [Rogier] has not and will not provide legal, accounting, securities, or investment advice. Valuation of [ATEC's] company and negotiation of the Buy & Sell Agreement shall be the responsibility of [ATEC]. [Rogier] shall not be responsible for any guarantees or warranties. [ATEC] shall rely upon [ATEC's] investigation and opinion of the Buyer.

8. METHOD OF PAYMENT. The services outlined in this agreement may result in a merger, acquisition, joint-venture, sub-contract, association, teaming or employment contract; if any such

event occurs, the Buyer (the other firm or individuals) shall pay [Rogier].

Under the agreement, Rogier supplied ATEC with a merger and acquisition manual containing a form search agreement that he would execute with a buyer interested in acquiring or entering into a business combination with a firm such as ATEC. The form agreement provided that Rogier would "search for acquisition candidates which meet the [b]uyer's geographic, discipline and market goals" and "interview the [s]eller and obtain financial data." The form agreement also provided that the buyer would pay Rogier a commission on the date of closing.

From 1984 to 1989, Rogier routinely contacted ATEC with opportunities to sell the company. However, Gerald Mann, the president of ATEC, did not begin to take "active steps" to sell the business until 1990, nearly six years after signing the exclusive listing agreement with Rogier. In June of 1990, Rogier entered into a search agreement with Baker, a large engineering firm, under which Rogier agreed to search for companies that Baker could purchase. The search agreement was similar to the form agreement contained in the merger and acquisition manual Rogier had supplied to ATEC in 1984. But instead of requiring the buyer to pay a commission only on the date of closing, the Baker search agreement called for payment of a commission equal to five percent of ATEC's gross income for the year prior to the sale, with two percent to be paid immediately upon Rogier's sales presentation and an additional three percent to be paid at closing. The two percent portion of Rogier's fee was nonrefundable even if a closing did not occur; however, it could "be credited towards other seller presentations." From mid–1990 until the end of 1993, Rogier did not communicate with ATEC. The record reflects that he continued to work under the parties' exclusive listing agreement, but that ATEC was unaware he was doing so.

On or about January 21, 1994, Rogier sent written notification to ATEC that Baker was interested in acquiring an environmental engineering firm such as ATEC. Rogier requested that ATEC sign a purchase offer letter, which would serve as ATEC's authorization for Rogier to present ATEC as an acquisition candidate to Baker. After Rogier's third request, ATEC forwarded a purchase offer letter to Rogier on May 5, 1994. The letter stated in part:

> If the prospective buyer is interested in making an offer to purchase our firm, we will provide you with materials describing our firm, such as brochures, financial statements, etc. so that the Buyer can make a realistic offer.

ATEC further acknowledged that Baker would be paying Rogier's commission and specifically requested that this term be included in Baker's purchase offer.

On May 26, 1994, Baker reaffirmed its interest in making an offer to purchase ATEC's business and requested that Rogier obtain five years of ATEC's financial statements, backlog report, stockholder list, and asking price "so that we can make a realistic offer[.]" In June and July of 1994, Rogier communicated with ATEC and Baker in an effort to finalize the sale of ATEC's business. However, Rogier was unable to make a sales presentation to Baker because ATEC refused to provide the necessary financial statements and other operations data. ATEC had recently sustained several million dollars in financial losses from government contracts, which Mann believed to be a temporary financial setback. Although Mann knew that ATEC was obligated to provide financial statements to all approved prospective buyers presented by Rogier, he admitted that he did not do so due in large part to his concerns that a potential buyer reviewing ATEC's financial statements might be misled into believing ATEC was financially unsound. On July 29, 1994, Baker advised Rogier that it was no longer interested in pursuing the acquisition of ATEC. Rogi-

er's last communication with ATEC occurred on July 29, 1994, although Rogier's time records indicate that he continued to work for ATEC under the parties' exclusive listing agreement beyond that date.

In mid–1994, unbeknownst to Rogier, ATEC began its first contacts with ATC. By late 1995, ATEC had provided ATC with financial documents for purposes of a sales presentation. In 1996, ATEC sold its business to ATC, without informing Rogier of the sale and without using another broker, for a large eight-figure sum.

Rogier learned about the sale from a local business journal in June of 1996. He filed suit, alleging that ATEC had breached the parties' exclusive listing agreement by: (1) refusing to provide the necessary financial information to Baker, causing Baker to lose interest in ATEC's business and costing Rogier a multi-million dollar sales presentation fee; and (2) failing to disclose the sale of its business to ATC. Rogier sought recovery of his fee for the lost-opportunity to make a sales presentation to Baker,[1] as well as a commission on the sale of ATEC's business to ATC.[2] ATEC moved for summary judgment, alleging that Rogier had sustained no damages from ATEC's conduct and that the parties' exclusive listing agreement was unenforceable, had terminated, or was abandoned or waived by Rogier as a matter of law. The trial court entered summary judgment in favor of ATEC. This appeal ensued.[3]

## DISCUSSION AND DECISION

### Standard of Review

■ Our analysis proceeds from the premise that summary judgment is a lethal weapon and that courts must be ever mindful of its aims and targets and beware of overkill in its use. *Bunch v. Tiwari*, 711 N.E.2d 844, 847 (Ind.Ct.App.1999). Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *Id.*; Ind. Trial Rule 56(C). When reviewing an entry of summary judgment, we stand in the shoes of the trial court. *Sizemore v. Templeton Oil Co.*, 724 N.E.2d 647, 650 (Ind. Ct.App.2000). We do not weigh the evidence but will consider the facts in the light most favorable to the nonmoving party. *Id.* All doubts as to a factual issue must be resolved in the nonmovant's favor. *Bunch*, 711 N.E.2d at 848. A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant has the burden of demonstrating that the grant of summary judgment was erroneous. *Id.* (citation omitted). Nevertheless, we must carefully assess the trial court's decision to ensure the nonmovant was not improperly denied his day in court. *Id.*

■ Generally, construction of a written contract is a question of law for the trial court for which summary judgment is particularly appropriate. *Mid State Bank v. 84 Lumber Co.*, 629 N.E.2d 909, 914 (Ind.Ct.App.1994). However, if the terms of a written contract are ambiguous, it is the responsibility of the trier of fact to ascertain the facts necessary to construe the contract. *Id.* Consequently, whenever summary judgment is granted based upon the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that the contract ambiguity, if one exists, can be resolved without the aid of a factual determination. *Id.*

### Issue One: Foreseeability of Damages from Baker Search Agreement

■ ATEC maintains that because "the terms of the Baker [search] [a]greement were unknown and unknowable by ATEC, any resulting damages could not be fore-

---

1. Two percent of ATEC's 1993 gross revenues.

2. Five percent of ATEC's 1995 gross revenues.

3. We heard oral argument on August 1, 2000.

seeable." ATEC contends that Rogier never disclosed the term in the Baker search agreement calling for payment of a nonrefundable fee due upon Rogier's sales presentation. ATEC further contends that this term was fundamentally different from the term in the form agreement contained in Rogier's merger and acquisition manual, which called for payment of a commission only on the closing date. Thus, ATEC reasons that it could not have foreseen it would be liable in damages for a commission based on its failure to provide Rogier with the financial documents necessary to make a sales presentation to Baker.

The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Shumate v. Lycan*, 675 N.E.2d 749, 753 (Ind.Ct.App.1997), *trans. denied.* Generally, the measure of damages for breach of contract is either such damages as may fairly and reasonably be considered as arising naturally, i.e., according to the usual course of things from the breach of contract itself, or as may be reasonably supposed to have been within the contemplation of the parties at the time they entered into the contract as a probable result of the breach. *Indiana & Michigan Elec. Co. v. Terre Haute Indus., Inc.*, 507 N.E.2d 588, 601 (Ind.Ct.App. 1987), *trans. denied; see also Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 620 (1854). A promisor is not required to compensate the injured party for injuries which, when the contract was made, the promisor had no reason to believe would be a probable result of the breach. *Id.* The test for measuring damages is foreseeability at the time of entry into the contract, not facts existing and known to the parties at the time of the breach; the test is an objective one. *Id.* Conversely, damages which do not arise naturally from the breach of contract, or which are not within the contemplation of the parties at the time the contract is entered into, are not recoverable. *Id.* at 602.

Our review of the record makes it clear that ATEC breached its duty to provide Rogier with the financial documents necessary to make a sales presentation to Baker. Indeed, ATEC was required by the parties' exclusive. listing agreement to "provide [Rogier] with company records and data for the purpose of preparing the presentation." Moreover, in its purchase offer letter ATEC authorized Rogier to present ATEC as an acquisition candidate to Baker and reaffirmed that it would provide Rogier "with materials describing our firm, such as brochures, financial statements, etc. so that the Buyer can make a realistic offer." Baker specifically requested such materials "so that we can make a realistic offer[.]" Having accepted Baker as a potential buyer, it was incumbent upon ATEC to supply Rogier with the necessary documentation.

Still, even assuming ATEC breached its duty to provide financial documents to Rogier, and without determining whether the failure to produce such documents caused Baker to lose interest in ATEC as an acquisition candidate, we conclude as a matter of law that any damages arising from that breach were unforeseeable. The evidence is undisputed that at the time the parties entered into their exclusive listing agreement, ATEC had no reason to believe Rogier would be entitled to a sales presentation fee irrespective of whether a sale took place. In particular, the listing agreement provides that the buyer will pay Rogier a fee only "if" a merger, acquisition, joint-venture, sub-contract, association, teaming or employment contract occurs. The form agreement supplied in the merger and acquisition manual further indicates that payment would occur "[o]n the closing date." As such, the damages which Rogier alleges resulted from the lost opportunity to make a sales presentation to Baker were not foreseeable and were, therefore, unrecoverable. Absent damages, Rogier's claim based upon the Baker search agreement must fail as a matter of law.

## Issue Two: Exclusive Right to Sell

 ATEC argues that it was "not required but retained its own discretion to sell its business" and that the parties' exclusive listing agreement "impose[d] no duty on ATEC ... to allow Rogier to make a [sales] presentation to anyone." Stated otherwise, ATEC urges that the parties' exclusive listing agreement conferred upon Rogier merely an exclusive agency, not an exclusive right to sell, which would entitle him to a commission even if he were not the procuring cause of the sale of ATEC's business. We disagree and conclude that Rogier possessed an exclusive right to sell.

 It has long been the rule in Indiana that a broker earns its commission when it causes a sale or procures a buyer ready, willing, and able to purchase the property. *Bishop v. Sanders,* 624 N.E.2d 64, 66 (Ind.Ct.App.1993), *trans. denied;* 12 Am.Jur.2d *Brokers* § 236 (1997) (noting that "[i]n the absence of a special contract to the contrary, a broker must be the procuring cause of a sale or transaction in order to be entitled to a commission thereon"). Notwithstanding the doctrine of procuring cause, Indiana courts will enforce specific provisions in a listing contract which allow a broker to earn a commission under other circumstances. *Bishop,* 624 N.E.2d at 64. In particular, a listing contract may grant a broker the right to a commission even if the broker did nothing to contribute to the sale of the property and regardless of whether the sale was effected by the broker or the owner or by any other person. *Brown v. Maris,* 128 Ind.App. 671, 676–77, 150 N.E.2d 760, 763 (1958); *see also Sutton v. Roth, Wehrly, Heiny, Inc.,* 418 N.E.2d 229, 233 (Ind.Ct.App.1981).

 The determination of whether a broker is entitled to a commission even if it is not the procuring cause of the sale depends upon whether the listing contract creates an exclusive agency or an exclusive right to sell. The distinction between an exclusive agency and an exclusive right to sell is discussed fully at 12 Am.Jur.2d *Brokers* § 282, where the writer observes:

With respect to the right of a broker to compensation on a sale negotiated by the employer without the aid of the broker, a distinction is frequently raised between an exclusive agency to sell and an exclusive right of sale. An "exclusive agency" agreement, prohibiting the owner from selling property through another broker during the listing period, but permitting the owner to sell property through his own efforts, is distinguishable from an "exclusive right to sell" agreement, prohibiting the owner from selling personally or through another broker without incurring liability for commission to the original broker. Where an exclusive agency is given the broker, the owner may still sell the property without liability to the broker unless the broker has procured a purchaser able and willing to buy prior to such time. The right of the owner of the property to sell is implied in such agency. The only effect of such a contract is to prevent the owner from placing the property in the hands of another agent.

On the other hand, where a broker is given an exclusive right to sell property, as distinguished from an exclusive agency, the broker is entitled to the agreed commission, or at least damages, when a sale is made by the owner, and it is immaterial that the broker was not the procuring cause thereof, provided, however, that the employment contract is supported by consideration and is not a mere unilateral offer, and provided also, according to some cases, that the broker has produced a ready, able, and willing purchaser or can show damages. In the case of an exclusive right to sell property, there is an implied promise on the part of the owner to do nothing to hinder or obstruct performance by the broker. However, an exclusive right of sale may, under certain circumstances, not deprive the owner of the right to sell his

property without liability to the broker. Moreover, the absolute exclusion of an owner's right to sell the property can only be effected by clear and unequivocal terms or necessary implication. (Footnotes omitted).

 In deciding whether the parties' exclusive listing agreement was an "exclusive agency" agreement or an "exclusive right to sell" agreement, we look to the particular language of the contract. *See Brown,* 128 Ind.App. at 677, 150 N.E.2d at 763 (holding that rights of broker are controlled by particular language of contract). As with any other contract, we apply the well-settled principles of contract interpretation. A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation. *Piers v. American United Life Ins. Co.,* 714 N.E.2d 1289, 1290 (Ind.Ct. App.1999). Absent ambiguity, the terms of a contract will be given their plain and ordinary meaning. *George Uzelac & Assocs. v. Guzik,* 663 N.E.2d 238, 240 (Ind. Ct.App.1996), *trans. denied.* The terms of a contract are not considered ambiguous merely because controversy exists between the parties concerning the proper interpretation of terms. *Id.* Where terms are clear and unambiguous, they are conclusive and this court will not construe the contract or view extrinsic evidence, but will instead apply the contractual provisions. *Id.; American Family Life Assur. Co. v. Russell,* 700 N.E.2d 1174, 1177 (Ind. Ct.App.1998) (observing that this court cannot ignore plain words of contract), *trans. denied.*

Here, the parties' agreement specifically states that Rogier is "the exclusive agent with an exclusive listing and *all prospective buyers shall send copies of all correspondence and purchase offers to [ATEC] and to [Rogier]."* The plain and ordinary meaning of the agreement's exclusive listing provision is that Rogier shall be informed of and shall participate in negotiations with *all* prospective buyers, without exception and regardless of how they were

procured. "All" means "[e]very," "[a]ny whatsoever," or "[t]he entire or total number, amount, or quantity; totality." *See* THE AMERICAN HERITAGE DICTIONARY (3d ed.1992) 47. This is the only reasonable interpretation of the agreement.

Therefore, under the clear and unambiguous language of the exclusive listing agreement, ATEC relinquished its right to sell its business on its own. *See Brown v. Miller,* 45 Ill.App.3d 970, 4 Ill.Dec. 649, 360 N.E.2d 585, 586 (1977). Having done so, ATEC's exclusion of Rogier from its negotiations with ATC was improper. Rogier possessed an exclusive right to sell ATEC's business and, if the agreement was otherwise valid, Rogier was entitled to a commission on the sale of the business to ATC, irrespective of whether he was the procuring cause of that sale.

### Issue Three: Enforceability

ATEC next argues that the parties' exclusive listing agreement is unenforceable as a matter of law. Specifically, ATEC alleges that the agreement is: (1) "uncertain as to duration and consideration;" and (2) illusory and lacks mutuality of obligation because it imposed no responsibility on Rogier to perform. We address each claim in turn.

#### A. Uncertainty

 "Where the contract is silent as to its duration, it is the general rule that the broker is given only a reasonable time within which to accomplish the object of the agency." 12 Am.Jur.2d *Brokers* § 74. A contract providing for continuing performance and which has no termination date, or which provides that it will last indefinitely, is terminable at will by either party. *Marksill Specialties, Inc. v. Barger,* 428 N.E.2d 65, 69 (Ind.Ct.App.1981). Such a contract would thus be enforceable until terminated. Here, the record reflects, and both parties concede, that their exclusive listing agreement was never terminated, either orally or in writing, prior to the sale of ATEC's business to ATC. Therefore, the agreement was not ren-

dered unenforceable merely because it lacked a termination date.

■ Nevertheless, ATEC contends that Rogier did not perform as an agent under the listing agreement within a reasonable time. *See* 12 Am.Jur.2d *Brokers* § 74. ATEC cites *Barney v. Yazoo Delta Land Co.*, 179 Ind. 337, 345–46, 101 N.E. 96, 99 (Ind.1913), in which our supreme court observed:

> If the [broker's] employment is to find a purchaser at a stated price and upon given terms, and the broker has expended his time and performed labor in getting the parties interested, he will be allowed *a reasonable length of time in which to complete his labors,* unless a definite time has been agreed upon within which he is to produce a purchaser.... In case the broker fails to find a purchaser *within a reasonable time* and opportunity to do so, the principal is at liberty to sell the property at less than the fixed price, without incurring liability for commissions.

(Emphasis added, citations omitted). The question of what constitutes a reasonable time within which to perform an act is generally one for the trier of fact and depends on the particular facts of each case, including the subject matter of the contract, the situation of the parties, and the circumstances attending performance.[4] *Bond v. Peabody Coal Co.*, 450 N.E.2d 542, 549 (Ind.Ct.App.1983); 12 Am.Jur.2d *Brokers* § 74.

■ In the present case, Mann did not actively consider a buyer for ATEC's business until 1990, nearly six years after signing the exclusive listing agreement with Rogier. He testified at his deposition that it takes years to sell a business such as ATEC. Indeed, the evidence reflects that approximately a year and a half passed between the time ATEC began negotiations with ATC and the date of the sale. Rogier's deposition confirms that it can take much longer than one or two years to motivate a large company such as ATEC to sell. Rogier testified that Mann had even advised him "he was going into a holding pattern for a couple of years, so that's why there was no communication or attempt to sell ATEC to Baker until 1994." He further testified that it was not uncommon for the sale of a business such as ATEC to take several years to conclude, which was the very reason he did not include a termination date in the parties' exclusive listing agreement. Where material facts conflict or undisputed facts lead to conflicting inferences, summary judgment is inappropriate. *Shourek v. Stirling,* 652 N.E.2d 865, 867 (Ind.Ct.App. 1995). Accordingly, there remains a genuine issue of material fact regarding whether Rogier failed to perform his obligation as ATEC's agent within a reasonable time.

■ With respect to ATEC's claim regarding the consideration underlying the parties' exclusive listing agreement, it is not proper for courts to inquire into the adequacy of consideration. *See Harrison–Floyd Farm Bureau Co-op. Ass'n, Inc. v.*

---

4. Our courts have held in some cases that when the facts are not in dispute, what constitutes a reasonable amount of time is a question of law for the court to decide. *See, e.g., Erie Ins. Exch. v. Stephenson,* 674 N.E.2d 607, 611 (Ind.Ct.App.1996) (concluding as matter of law that plaintiff did not satisfy reasonable notice requirement of insurance policy where there was four-year delay between accident and notification); *Auffenberg v. Board of Trustees,* 646 N.E.2d 328, 331 (Ind.Ct.App. 1995) (observing that when the underlying material facts are undisputed, what constitutes a reasonable time to object to a statement of account is a question of law). In this case, given the circumstances surrounding the execution of the parties' exclusive listing agreement, their lengthy course of dealing which included an agreed upon "holding pattern" during which there was no communication or sales activity, and the testimony that it often takes an extended length of time to market and sell a multimillion dollar business such as ATEC, we decline to hold as a matter of law that a time period in excess of ten years was unreasonable. *See* 12 Am.Jur.2d *Brokers* § 74 (noting that what constitutes a reasonable time is ordinarily a question of fact "unless the evidence is susceptible of only one reasonable inference in that respect").

*Reed,* 546 N.E.2d 855, 856 (Ind.Ct.App. 1989). As we explained in *Reed:*

> The doing of an act by one at the request of another which may be detrimental inconvenience, however slight, to the party doing it or may be a benefit, however slight, to the party at whose request it is performed, is legal consideration for a promise by such requesting party. When the thing agreed upon has no determined value, the judgment of the parties as to its sufficiency will not be disturbed by the court.

*Id.* Rogier expended many hours in search of a buyer. He provided ATEC with the required acquisition and merger manual and presented ATEC with several potential buyers over the course of their relationship. "[W]hen the broker, in good faith and in compliance with its implied promise to make an effort to sell the property, expends time, energy, and money to find a purchaser or successfully completes the undertaking, there is sufficient consideration for the promise to pay a commission, and the agreement becomes a bilateral and binding contract." 12 Am.Jur.2d *Brokers* § 46; *see also Brown,* 128 Ind. App. at 677, 150 N.E.2d at 763 (holding that if real estate owner has specifically agreed to pay broker commission regardless of circumstances under which property involved is sold, such contract is supported by sufficient consideration and is enforceable). The parties' exclusive listing agreement was supported by sufficient consideration and was not so uncertain as to render it unenforceable as a matter of law.

### B. Mutuality of Obligation

 Next, we disagree with ATEC's assertion that the parties' exclusive listing agreement is invalid because it imposed no obligation upon Rogier to perform. ATEC correctly notes that the existence of a valid contract depends upon mutuality of obligation. *Marksill Specialties,* 428 N.E.2d at 69. In other words, there can be no contract unless both parties are bound.

*Id.* Where, however, one party to the agreement acts upon the promise of the other party and performs his part of the agreement, the contract is not unenforceable for lack of mutuality. *Id.* Here, not only did the contract impose upon Rogier a specific obligation to search for a buyer, he performed hours of work and proposed several potential buyers in furtherance of that obligation. The parties' exclusive listing agreement was not unenforceable as a matter of law for lack of mutuality. *See id.; see also* 12 Am.Jur.2d *Brokers* § 45 (discussing necessity of consideration).

### Issue Four: Lapse Due to Passage of Time

 ATEC also maintains that the passage of time caused the parties' exclusive listing agreement to lapse as a matter of law. "The law is clear that a broker may not recover compensation for services rendered by him without a written contract of employment, and that even where such a contract exists, its terms may be revoked through the lapse of time." *Smitley v. Nau,* 143 Ind.App. 113, 119, 238 N.E.2d 681, 685 (1968). We have noted that a contract which is silent as to its duration should be performed within a reasonable time, and we have determined in this case that the assessment of what is reasonable is a question for the trier of fact. We likewise conclude that the issue of whether the parties' agreement had lapsed is also a question for the trier of fact. *See* 12 Am.Jur.2d *Brokers* § 74 (addressing authority for proposition that mere lapse of reasonable time is not, as matter of law, in itself sufficient to work termination of broker's employment). Because the exclusive listing agreement was to continue for a reasonable length of time absent termination by either party, and because the evidence of the parties' conduct and course of dealing supports more than one inference, we decline to hold as a matter of law that the parties' exclusive listing agreement had lapsed.

### Issue Five: Abandonment

■ ATEC further contends that Rogier abandoned the parties' exclusive listing agreement by his own inaction. In particular, it alleges that Rogier's failure to communicate for approximately two years, from July 29, 1994 until after ATEC sold its business to ATC in 1996, constituted an abandonment of the parties' agreement as a matter of law.[5] Again, we disagree.

■ In *Baker v. Estate of Seat*, 611 N.E.2d 149, 152 (Ind.Ct.App.1993), we discussed the law of abandonment as follows:

*The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted.* An abandonment of a contract need not be express but may be inferred from the conduct of the parties and attendant circumstances. A contract will be treated as abandoned when the acts of one party, inconsistent with the existence of the contract, are acquiesced in by the other party.

Abandonment of a contract is a mixed question of law and fact; what constitutes an abandonment is a question of law; and *whether there has been an abandonment is a question of fact.*

*Id.* (quoting 17A Am.Jur.2d *Contracts* § 543 (1991)) (emphasis added); *see also* 12 Am.Jur.2d *Brokers* § 269 (observing that "[t]he question as to when the broker will be deemed to have abandoned employment or efforts depends upon the facts of the individual case and is ordinarily a question for the jury.").

■ Here, the evidence is undisputed that Rogier did not contact ATEC for the period from July 29, 1994 until 1996. But even where the facts are undisputed, the ability to reasonably draw from them conflicting inferences which would alter the outcome will make summary judgment inappropriate. *Letson v. Lowmaster*, 168 Ind.App. 159, 161, 341 N.E.2d 785, 787 (1976); *see also Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 284 (Ind.1991) (stating that summary judgment should not be granted where it is necessary to weigh evidence). A trier of fact could reasonably infer that two years was not a sufficient length of time to constitute an abandonment on the facts of this case. This is particularly true where, as we have already noted, the evidence shows that Mann did not actively consider a buyer for ATEC's business until nearly six years after signing the exclusive listing agreement with Rogier and that the parties' course of dealing included a long period of time or "holding pattern" in which they did not communicate and there was no sales activity. The evidence also shows that it can take years to sell a large business such as ATEC. "[T]he mere fact that some time elapses after the broker has discontinued his efforts to make a sale, before the sale is made in fact by the owner, is not evidence [in and] of itself that there has been a complete abandonment of the negotiations." *Collopy v. Field*, 127 Kan. 68, 272 P. 99, 100 (1928) (citation omitted); 12 Am.Jur.2d *Brokers* § 269. Thus, there exists a genuine issue

---

5. In its appellate brief, ATEC predicated its claim of abandonment on Rogier's failure to communicate for approximately three-and-a-half years, from June 12, 1990 until December of 1993. At oral argument, however, ATEC conceded that this claim was not its "strongest argument" for abandonment and argued instead that it was Rogier's failure to communicate from July 1994 until after the sale of ATEC's business to ATC in 1996 which constituted an abandonment of the parties' exclusive listing agreement as a matter of law. ATEC would be hard-pressed to show that the listing agreement had been abandoned prior to 1994, in that after the period of inactivity from June 1990 to December 1993, Rogier presented Baker as a potential buyer to ATEC, and ATEC authorized Rogier to present ATEC as an acquisition candidate. At no time did ATEC inform Rogier that it believed the parties' exclusive listing agreement had terminated or treat the agreement as abandoned. Instead, ATEC, by its own conduct, may be deemed to have reaffirmed the vitality of the listing agreement as late as 1994.

of material fact regarding whether Rogier abandoned the parties' exclusive listing agreement.

### Issue Six: Waiver

ATEC urges that Rogier waived his rights under the parties' exclusive listing agreement as a matter law. Waiver is an intentional relinquishment of a known right involving both knowledge of the existence of the right and the intention to relinquish it. *van de Leuw v. Methodist Hosp. of Indiana, Inc.,* 642 N.E.2d 531, 533 (Ind.Ct.App.1994). ATEC claims that Rogier waived his rights under the listing agreement by: (1) never discussing with ATEC the "allegedly 'exclusive'" nature of their relationship; and (2) failing to "communicate with ATEC for long time periods[.]"[6]

As discussed previously, the rights of a broker are controlled by the particular language of the listing contract. *See Brown,* 128 Ind.App. at 677, 150 N.E.2d at 763. Irrespective of what Rogier "discussed" with ATEC, the clear and unambiguous language of their exclusive listing agreement conferred upon him an exclusive and unequivocal right to sell ATEC's business. *See* discussion, Issue Two.

In addition, having held that what constitutes a reasonable amount of time is a question for the trier of fact, we likewise conclude that whether Rogier's failure to communicate with ATEC for certain periods of time resulted in waiver of his rights under the parties' listing agreement is a question of fact. *See van de Leuw,* 642 N.E.2d at 533 (observing that whether there has been a waiver of a contract provision is ordinarily a question of fact). Specifically, mere silence, acquiescence or inactivity does not amount to waiver unless

there is a duty to speak or act. *American Nat. Bank & Trust Co. v. St. Joseph Valley Bank,* 180 Ind.App. 546, 554, 391 N.E.2d 685, 687 (1979). Again, the evidence reflects that Mann did not actively consider a buyer for ATEC's business until nearly six years after signing the exclusive listing agreement with Rogier and that the parties' course of dealing included an extended period of time in which they did not communicate due to ATEC's self-imposed "holding pattern." Thus, there remains a genuine issue of material fact regarding whether Rogier waived his rights under the parties' exclusive listing agreement.

### Issue Seven: Prevention of Performance

Finally, we observe that a party who has breached a contract cannot take advantage of his breach to relieve him of his contractual obligations. *American Nat. Bank & Trust,* 180 Ind.App. at 554, 391 N.E.2d at 687 (citing 17A C.J.S. *Contracts* § 458 (1963)). Specifically, the common law of contracts excuses performance of one party where the other party wrongfully prevents that performance. *Stephenson v. Frazier,* 399 N.E.2d 794, 798 (Ind. Ct.App.1980), *trans. denied; Maddox v. Wright,* 489 N.E.2d 133, 137 (Ind.Ct.App. 1986). Where one party to an executory contract repudiates it and refuses to be bound by it, the injured party has the right to elect and pursue various remedies, including treating the contract as terminated, without notice or demonstration that it had at all times been ready, willing and able to perform. *City of Indianapolis v. Twin Lakes Enter., Inc.,* 568 N.E.2d 1073, 1080 (Ind.Ct.App.1991), *trans. denied.* Under such an election, the injured party can sue at once to recover the damages resulting from the wrongful refusal to

---

**6.** ATEC also claims that Rogier breached his fiduciary relationship with ATEC by failing to disclose the terms of his search agreement with Baker and "[s]imultaneously and dually" representing both ATEC and Baker, which was "an obvious and apparent conflict of interest." Given our determination that the damages arising from Rogier's inability to make a sales presentation to Baker were unforeseeable and therefore unrecoverable as a matter of law, we need not address ATEC's allegation of waiver premised on Rogier's dual employment. *See* discussion, Issue One.

carry out the contract according to its terms. *Id.*

■■■ Moreover, in *Hamlin v. Steward,* 622 N.E.2d 535, 540 (Ind.Ct.App. 1993), we recognized the rule that a party may not rely on the failure of a condition precedent to excuse performance where that party's own action or inaction caused the failure. When a party retains control over when the condition will be fulfilled, it has an implied obligation to make a reasonable and good faith effort to satisfy the condition. *Id.* "The *Hamlin* doctrine prevents a party from acts of contractual sabotage or other acts in bad faith by a party that cause the failure of a condition." *Indiana State Highway Comm'n v. Curtis,* 704 N.E.2d 1015, 1019 (Ind.1998). Indeed, "[i]n the case of an exclusive right to sell ..., there is an implied promise on the part of the owner to do nothing to hinder or obstruct performance by the broker." 12 Am.Jur.2d *Brokers* § 282.

Here, ATEC's failure to notify Rogier of its negotiations with ATC made Rogier's performance as ATEC's agent with an exclusive right to sell virtually impossible. *See Maddox,* 489 N.E.2d at 137 (observing that party made performance of land contract impossible). Although ATEC's listing agreement with Rogier applied to "all buyers," ATEC excluded Rogier from its year-and-a-half of discussions with ATC. Rogier did not learn of the sale of ATEC's business to ATC until he read about it in a local business journal in June of 1996. ATEC's conduct could be perceived as an act of "contractual sabotage" and a breach of its duty under the parties' exclusive listing agreement, which, in turn, relieved Rogier of performing his obligations under the agreement. *See id.; see also Salin Bank & Trust Co. v. Violet U. Peden Trust,* 715 N.E.2d 1003, 1008 (Ind.Ct.App. 1999) (concluding that bank's retention of incompetent appraiser to value property constituted defective performance of its duty under contract and that such defective performance relieved landowner of

performing his duty to obtain competent appraiser), *trans. denied.*

Without a duty to perform, Rogier could not be found in breach of the parties' exclusive listing agreement. *See Salin Bank,* 715 N.E.2d at 1008. After hearing the evidence, a trier of fact might well conclude that Rogier was ready, willing, and able to perform as ATEC's exclusive agent but that ATEC simply excluded him from the transaction with ATC, thereby attempting to deprive him of a commission. *See Maddox,* 489 N.E.2d at 137 (holding that although party was willing to fulfill land contract, other party's failure to cooperate in any way excused performance). Indeed, a trier of fact might conclude that ATEC unilaterally and silently repudiated the listing agreement. Regardless, whether a breach of contract has occurred is a question of fact to be determined by the trier of fact. *See Twin Lakes,* 568 N.E.2d at 1077.

## CONCLUSION

In sum, we conclude that Rogier's damages, if any, arising out of ATEC's failure to provide Rogier with financial documents and Rogier's subsequent inability to make a sales presentation to Baker were unforeseeable and, therefore, unrecoverable as a matter of law. We thus affirm the trial court's grant of summary judgment in favor of ATEC on all claims involving Rogier's lost opportunity to make a sales presentation to Baker. However, there remain genuine issues of material fact with respect to ATEC's claims of unenforceability, lapse, abandonment, and waiver precluding judgment as a matter of law in favor of ATEC. And, even assuming, as ATEC alleges, that Rogier failed to perform his obligations under the parties' exclusive listing agreement, there remains a genuine issue of material fact whether it was ATEC's own conduct in excluding Rogier from its negotiations with ATC that prevented him from performing. We reverse the trial court's grant of summary judgment on all claims involving the sale

of ATEC's business to ATC and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.

FRIEDLANDER, J., and MATHIAS, J., concur.